**United States District Court**
For the Northern District of California

1

2

3                          UNITED STATES DISTRICT COURT

4                         NORTHERN DISTRICT OF CALIFORNIA

5

6    SIMI MANAGEMENT CORPORATION,            No. C-11-05573-DMR

7              Plaintiff(s),                 **ORDER GRANTING IN PART AND
                                             DENYING IN PART DEFENDANT**
8         v.                                 **BANK OF AMERICA, N.A.'S MOTION
                                             TO DISMISS**
     BANK OF AMERICA CORPORATION,
9
               Defendant(s).
10   _____/

11

12        Defendant Bank of America, N.A. ("BofA") moves pursuant to Federal Rule of Civil

13   Procedure 12(b)(6) to dismiss Plaintiff Simi Management Corporation d/b/a Connell Auto Center's

14   ("Connell") complaint for failing to state a claim for aiding and abetting conversion and

15   embezzlement, aiding and abetting breach of fiduciary duty, and breach of contract.  (*See generally*

16   BofA's Notice of Mot. & Mot. to Dismiss; Mem. of P. & A. in Supp. Thereof ("Def.'s Mot.").)

17   Plaintiff opposes the motion.  (*See generally* Pl.'s Mem. in Supp. of Its Opp'n to Def. BofA's Mot.

18   to Dismiss ("Pl.'s Opp'n").)  The court conducted a hearing on January 26, 2012.  For the reasons

19   below, the court grants in part and denies in part Defendant's motion.

20                                    **I. Background**

21        Plaintiff, which operated automobile dealerships, discovered after selling its last franchises in

22   August 2007 that its long-time chief financial officer ("CFO") Roger Reichart had embezzled

23   millions of dollars from the firm from at least November 2001 onward.  (Compl. ¶¶ 1, 10.)  A year

24   after becoming CFO in 1994, he convinced Connell's management to transfer the company's assets

25   to BofA.  (Compl. ¶ 8.)  After Connell established its new account, BofA became aware of

26   Reichart's "position within the company and knew he exercised control over Connell Auto's

27   finances and bank accounts."  (Compl. ¶ 8.)  According to Plaintiff, Reichart frequently went to

28   BofA's principal branch in Oakland, California, and would present a Connell business check made

**United States District Court**

For the Northern District of California

payable to "Bank of America" or "Cash."  (Compl. ¶ 3.)  Bank employees then would give him cash

or a BofA cashiers check in return.  (Compl. ¶ 3.)  Over the course of hundreds of transactions and

many years, Reichart stole over $4 million from Plaintiff.  (Compl. ¶ 3.)  On September 29, 2011,

the Alameda County Superior Court convicted him of grand theft and tax evasion.  (Compl. ¶ 1.)

Plaintiff asserts that BofA knowingly participated in Reichart's scheme.  (Compl. ¶ 2.)

Specifically, Plaintiff alleges that BofA "knew and did the following:"

a) Bank of America issued at least 385 cashiers checks for Reichart, totaling $1,692,456, with payees such as "VISA", "American Express", "Neiman Marcus", and "Saks Fifth Avenue". . . . As Bank of America knew when it issued the cashiers checks with Connell Auto's funds, creditors such as Visa, American Express, Neiman Marcus and Saks Fifth Avenue do not need to be paid with cashiers checks, and the use of cashiers checks to pay such creditors would not appear on Connell's bank statements or cancelled checks.

b) In addition to the cashiers checks, employees at the Main Oakland Branch handed over enormous amounts of cash to Reichart.  By 2007, on a weekly basis, Reichart was walking out of the Oakland Main Branch doors with anywhere between $16,000 to $44,000 in cash and cashiers checks taken from Connell Augo's bank accounts, and he was doing so by structuring his withdrawals to be in increments less than $10,000.00 each, and generally less than $5,000.00 each.  His weekly average in 2007 was more than $27,000 in cash and cashiers checks.

c) To evade Bank of America's transaction reporting requirements under federal law as well as the bank's internal controls, over 95% of the transactions conducted by Reichart and the Main Oakland Branch were carried out using Connell Auto company checks that did not exceed $10,000.  Stealing millions of dollars by checks made payable in amounts less than $10,000 requires lots of trips to the bank.  Reichart was in Oakland Main Branch numerous times a week, every week of the month, presenting Connell Auto company checks to obtain more than $10,000 in cash and cashiers checks from Connell Auto's accounts--however, the two Connell Auto checks used to obtain the cash and cashiers checks were each under $10,000.  If the transactions were legitimate there would be no reason to use two separate company checks--Reichart and Bank of America would have used one check for the total amount of the transaction (*i.e.*, in an amount over $10,000).

d) Cornell auto is informed and believes, and thereon alleges, that Bank of America employees are trained to recognize "structuring" or "smurfing" undertaken to evade regulatory reporting requirements, and therefore knew at all times that Reichart was engaged in such illegal activities using his employer's funds.

e) Every Bank of America cashiers check contains a Remitter line identifying the purchaser of the check.  On many occasions, Bank of America intentionally altered the identity of the Remitter imprinted on the cashiers check to falsely show someone other than Connell Auto as the purchaser of the cashiers check.

f) Bank of America issued statements for Connell Auto's bank accounts that did not accurately disclose the cash and cashiers check transactions, and did not show that Bank of America was regularly issuing cashier checks with payees such as "VISA", "American Express", "Neiman Marcus" and "Saks Fifth Avenue".  The bank

2

**United States District Court**

For the Northern District of California

1    statements issued by Bank of America in fact concealed where Connell Auto's
2    monies were going, and to whom.

3    g) After withdrawing cash from Connell Auto's bank accounts, Reichart would
     sometimes deposit the cash into a Bank of America personal checking account
4    maintained in the name of Lorraine Espiritu.  Withdrawing the cash from Connell
     Auto's account and depositing it into Espiritu's checking account took place in the
5    same banking transaction, by the same Oakland Main Branch teller.  Bank of
     America also issued many cashiers checks payable to it and then credited those
6    checks to Bank of America loan accounts in Espiritu's name and to Espiritu's Banc
     [sic] of America brokerage account.  Bank of America knew that these Espiritu Bank
7    of America accounts were not accounts affiliated with Connell Auto in any way.

8    h) Bank of America issued cashiers checks payable to an individual but then allowed
     Reichart to negotiate the check himself for cash.

9    i) When other Bank of America branches or financial institutions were presented with
     cashiers checks for negotiation and called the Oakland Main Branch with questions
10   regarding the suspicious transaction, Oakland Main Branch employees told those
     institutions to proceed with the transaction and accept the check.
11
     j) In most instances, when Reichart presented a Connell Auto check to be converted
12   into a Bank of America cashiers check, Bank of America accepted a Connell Auto
     check with only Reichart's signature, notwithstanding that the Connell Auto checks
13   had two lines for two authorized signatures.  Aside from any question as to whether
     the item was properly payable, the Connell Auto check had an obvious irregularity.
14
     k) When Connell Auto discovered Reichart's embezzlement scheme, it contacted
15   Bank of America to obtain copies of its checks and the cashiers checks purchased
     with its monies.  Bank of America briefly cooperated, but then abruptly stopped
16   providing Connell Auto copies of the cashiers checks, no doubt realizing they
     evidenced Bank of America's knowing participation in Reichart's embezzlement
17   scheme.  It did not resume providing Connell Auto with copies of its own checks and
     the cashiers checks purchased with its monies until ordered to do so by Judge Tigar
18   of the Alameda County Superior Court.  Even then, Bank of America dragged its feet,
     allowing needed records to be allegedly destroyed as part of Bank of America's
19   supposed general retention policies for customer accounts.

20   (Compl. ¶ 4; *accord* Compl. ¶¶ 10-14, 18.)  In addition, Plaintiff asserts that BofA "continued to

21   engage in these transactions even though it knew they were not legitimate Connell Auto business

22   transactions" and that the bank employees "informed Reichart of the type of transactions that would

23   be flagged as suspicious or otherwise reviewed internally by other Bank of America personnel."

24   (Compl. ¶ 15; *accord* Compl. ¶ 16.)  In this manner, "Reichart and Bank of America, acting

25   together, concealed the true nature of the [embezzlement] transaction[s]."  (Compl. ¶ 16; *see* Compl.

26   ¶¶ 17, 22.)

27          Plaintiff filed suit against BofA in California state court on October 18, 2011, alleging aiding

28   and abetting conversion and embezzlement, aiding and abetting breach of fiduciary duty, and breach

**United States District Court**
For the Northern District of California

1  of contract.  (*See* Compl. ¶¶ 24-37.)  Defendant removed the case to this Court on the basis of

2  diversity jurisdiction on November 17, 2011.  [*See* Docket No. 1.]  Defendant now moves to dismiss

3  the complaint for failure to state a claim upon which relief can be granted.

### II. Motions to Dismiss for Failure to State a Claim

5  When reviewing a motion to dismiss for failing to state a claim, the court must "accept as

6  true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94

7  (2007) (per curiam) (citation omitted), and may dismiss the case "only where there is no cognizable

8  legal theory" or there is an absence of "sufficient factual matter to state a facially plausible claim to

9  relief." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citing

10  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)).  A claim has facial plausibility when a plaintiff

11  "pleads factual content that allows the court to draw the reasonable inference that the defendant is

12  liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citation omitted).

### III. Discussion

#### A. Plaintiff's Aiding and Abetting Claims

15  BofA contends that Plaintiff has failed to properly state aiding and abetting claims by

16  insufficiently alleging that BofA had actual knowledge of Reichart's criminal actions.  (Def.'s Mot.

17  4-9.)  The bank asserts that Plaintiff's complaint does not "allege specific facts showing that BofA

18  had actual knowledge of any wrongdoing on Reichart's part, let alone the specific wrong BofA

19  allegedly aided . . . .  Rather, the Complaint alleges, in conclusory fashion, that BofA knew of

20  Reichart's wrongful acts.  The conclusory allegations, without more, do not suffice." (Def.'s Mot. 6

21  (footnotes and citations omitted).)  BofA's motion papers do not contest Plaintiff's allegation that it

22  substantially assisted Reichart in his crimes, or that Reichart committed conversion and

23  embezzlement or breached his fiduciary duties to Plaintiff.

#### 1. Aiding and Abetting in California

25  Under California law, liability for aiding and abetting the commission of an intentional tort

26  attaches if a defendant "is [1] aware that the other's conduct constitutes a breach of duty and [2]

27  provides substantial assistance or encouragement to the other to so act." *In re First Alliance*

28  *Mortgage Co.*, 471 F.3d 977, 993 (9th Cir. 2006) (citation and quotation marks omitted); *accord*

**United States District Court**

For the Northern District of California

1  *Chance World Trading E.C. v. Heritage Bank of Commerce*, 438 F. Supp. 2d 1081, 1084 (N.D. Cal.

2  2005).  This standard requires that the defendant "have ***actual knowledge*** of the ***specific primary***

3  ***wrong*** the defendant substantially assisted."  *In re First Alliance Mortgage Co.*, 471 F.3d at 993

4  (emphasis added) (citation omitted); *accord Casey v. U.S. Bank Nat'l Assoc.*, 127 Cal. App. 4th

5  1138, 1146 (2005).  Mere allegations that a defendant had "vague suspicion of wrong doing" or

6  knew of "wrongful or illegal conduct . . . d[o] not constitute sufficient pleading" that the defendant

7  had "actual knowledge."  *In re First Alliance Mortgage Co.*, 471 F.3d at 993 n.4 (citation and

8  quotation marks omitted); *accord Casey*, 127 Cal. App. 4th at 1151 ("[T]he complaint must allege

9  the defendant's actual knowledge of the specific breach of . . . duty for which it seeks to hold the

10  defendant liable.").

11  　　　　　　**2. Analysis**

12  　　　Plaintiff has not adequately alleged that BofA had actual knowledge of Reichart's

13  embezzlement and conversion or his specific breach of fiduciary duty.  The complaint states that

14  "Bank of America . . . knowingly aided and abetted Reichart in his embezzlement scheme" and

15  "knowingly assisted, cooperated with and/or lent aid and encouragement in furtherance of Reichart's

16  conversion of [Plaintiff]'s monies."  (Compl. ¶¶ 20, 25.)  These statements heavily imply that BofA

17  knew that Reichart was committing embezzlement and conversion, but stop short of  the required

18  direct assertion that BofA had actual knowledge of Reichart's specific wrongdoing and helped him

19  carry it out.  Plaintiff's claim for aiding and abetting breach of fiduciary knowledge suffers a similar

20  defect.  In its complaint, Plaintiff asserts that BofA "knew of Reichart's position within [Connell,]"

21  "knew of his fiduciary duties to Connell," "knew Reichart's conduct was in violation of his fiduciary

22  duties to Connell," and "assisted, cooperated with and/or lent aid and encouragement in furtherance

23  of Reichart's breaches of fiduciary duty."  (Compl. ¶¶ 30-31.)  Though these assertions allege that

24  BofA knew of Reichart's breach of fiduciary duty, they do not state that the bank had actual

25  knowledge of the criminal activity -- embezzlement and conversion -- underlying the breach, as the

26  law requires.  *See Casey*, 127 Cal. App. 4th at 1149 ("[I]n order to analyze the sufficiency of a claim

27  for aiding and abetting breach of fiduciary duty, we must first 'identify precisely the breach of

28  fiduciary duty for which [Plaintiff] seeks to hold [the banks] liable.")  In other words, *Casey* requires

United States District Court

For the Northern District of California

1    an allegation of actual knowledge of the specific breach of fiduciary duty -- in this case,

2    embezzlement -- as well as substantial assistance in that breach.  Because Plaintiff has not properly

3    stated claims for aiding and abetting embezzlement and conversion, and aiding and abetting breach

4    of fiduciary duty, the court dismisses them with leave to amend.

5            **B. Plaintiff's Breach of Contract Claim**

6                **1. The Parties' Contentions**

7            Plaintiff claims that BofA breached an implied contract between them.[1]  (Compl. ¶ 35.)

8    According to Plaintiff, this contract stipulated that BofA would provide it "banking services . . . in

9    exchange for a fee," that BofA "would not pay an item using Connell Auto's accounts that was not

10   properly payable," and that Connell "could obtain copies of cancelled checks and other paper items

11   paid against its accounts" upon request.  (Compl. ¶ 35.)  Plaintiff asserts that BofA breached this

12   agreement when it "pa[id] items presented by Reichart that were not properly payable," when it did

13   not provide Plaintiff with copies of cancelled checks and other paper items paid against the firm's

14   accounts, and by destroying some of Plaintiff's banking records after receiving notice of Reichart's

15   embezzlement.  (Compl. ¶ 36.)

16           BofA, however, contends that the contractual agreement between it and Plaintiff is not an

17   implied contract, but a Master Agreement, also known as a signature card.  (Def.'s Mot. 10.)  BofA,

18   which has attached this alleged contract to its moving brief, notes that the Master Agreement states,

19   "Bank may pay out funds on any one of the signatures below:," and identifies Reichart as an

20   authorized signer on Plaintiff's account.  (Def.'s Mot. 10; Def.'s Reply 11; Wraight Decl. Ex. 1,

21   Nov. 23, 2011.)  Thus, contrary to Plaintiff's characterization of the contractual relationship between

22   it and BofA, BofA avers that it was entitled to assume as a matter of law that Plaintiff authorized

23   Reichart's actions.  (Def.'s Mot. 11.)  BofA asks the court to consider the contract under the

24   "incorporation by reference doctrine," which allows the court to consider documents referenced in

25   the pleadings but not attached to them.  (Def.'s Mot. 10 n.30; *accord* Wraight Decl. ¶ 3.)  BofA

26   _____

27          [1]  In its complaint, Plaintiff noted that "Connell has not located, and Bank of America has not
     provided to Connell Auto, a copy of any written agreement between the parties that was signed by Connell
     Auto." (Compl. ¶ 35.)  Plaintiff clarified at the hearing that, if such an agreement comes to light, it may move
28   to amend the complaint to add a cause of action for breach of written contract.

6

**United States District Court**
For the Northern District of California

1  presents no arguments against Plaintiff's claim that BofA breached their contract by not providing

2  Plaintiff with copies of cancelled checks and other paper items paid against the firm's accounts, and

3  by destroying some of Plaintiff's banking records.

4        Plaintiff assails BofA's argument on several grounds.  It insists that no written agreement

5  exists between it and BofA because the company, as opposed to its officers, never signed a contract

6  with the bank.  (Pl.'s Opp'n 13 ("Connell Auto *did not sign* the "Master Agreement", and it is *not*

7  the basis of Connell Auto's breach of contract claim.").)   It also claims that the court may not

8  consider the purported Master Agreement, because "neither the existence of nor the contents of" the

9  contract "is alleged in the Complaint."  (Pl.'s Opp'n 13.)  Moreover, Plaintiff states that the Master

10  Agreement "is not authenticated and Connell Auto has a legitimate basis to dispute its authenticity.

11  Connell Auto has no copy"of the agreement in its company files.  (Pl.'s Opp'n 14; *see* Logan Decl.

12  ¶¶ 6-8, Dec. 7, 2011.)

13                  **2. The Incorporation by Reference Doctrine**

14        When evaluating a Rule 12(b)(6) motion to dismiss, a court may look outside the pleadings

15  and consider a document if its authenticity is not contested and the complaint "necessarily relies"

16  upon it.  *Neilson*, 290 F. Supp. 2d at 1114 (quoting *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir.

17  1998)) (quotation marks omitted); *accord Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005)

18  (extending "incorporation by reference doctrine" to "situations in which the plaintiff's claim

19  depends on the contents of a document, the defendant attaches the document to its motion to dismiss,

20  and the parties to not dispute [its] authenticity," even if "the plaintiff does not explicitly allege the

21  contents of that document in the complaint" (citation omitted)).  This policy prevents a plaintiff from

22  surviving a motion to dismiss by intentionally "omitting references to documents upon which their

23  claims are based." *Neilson*, 290 F. Supp. 2d at 1114 (citation and quotation marks omitted).

24        At oral argument, BofA's counsel asserted that the Master Agreement is valid, and

25  constitutes the sole contract between the parties regarding the banking relationship. However,

26  Plaintiff reasonably disputes its authenticity.  Various statements on the Master Agreement itself

27  suggest that it may not be valid.  For example, as pointed out by Plaintiff, it does not appear to be

28  signed by a representative of the corporate customer, Simi Management Corp.  Moreover, a stamp

<div style="vertical-text">**United States District Court**
For the Northern District of California</div>

1   on the fact of the document reads "superseded by card dated 10-2-07." (*See* Wraight Decl. Ex. 1.)

2   Defendants' assertion that the Master Agreement is the sole contract between the parties is

3   contradicted by the face of the Master Agreement itself. It states: "You acknowledge receipt of the

4   deposit agreement. The agreement includes a provision for alternative dispute resolution." (Wraight

5   Decl. Ex. 1.) The court therefore will not apply the incorporation by reference rule and will not

6   consider the Master Agreement in the disposition of this motion.

7               **3. Analysis**

8         Plaintiff has properly stated a breach of contract claim. As highlighted during the hearing,

9   though, the contract or contracts at issue between the parties, be they implied and/or written, remain

10   unclear. Within this hazy factual context, BofA has failed to show that there is "no cognizable legal

11   theory" by which Plaintiff could prevail on this claim. *Shroyer*, 622 F.3d at 1041 (citation omitted).

12   The court therefore denies BofA's motion as to the Plaintiff's breach of contract claim.

13         Moreover, due to the same factual paucity of the record at this early stage of the litigation,

14   and the often factually dependent nature of statutes of limitations, the court does not address BofA's

15   statute of limitations arguments at this time. *See Cowen v. Aurora Loan Servs.*, No. 10-452, 2010

16   WL 3342196, at *5 (D. Ariz. Aug. 25, 2010).

17               **IV.  Conclusion**

18         The court grants in part and denies in part Defendant Bank of America's Motion to Dismiss.

19   Plaintiff's claims for aiding and abetting embezzlement and conversion, and for aiding and abetting

20   breach of fiduciary duty are dismissed with leave to amend. Plaintiff shall have until March 29,

21   2012 to file an amended complaint.

22         IT IS SO ORDERED.

23

24   Dated:  January 27, 2012

25



26                                 DONNA M. RYU
                                United States Magistrate Judge

27

28