**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8                     UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10

11   SIMI MANAGEMENT CORPORATION,              No. C 11-05573 DMR

12            Plaintiff(s),                    **ORDER GRANTING IN PART AND
                                               DENYING IN PART DEFENDANT'S
13        v.                                   MOTION FOR SUMMARY
                                               JUDGMENT; GRANTING
14   BANK OF AMERICA, N.A.,                     DEFENDANT'S MOTION TO STRIKE**

15            Defendant(s).
     _____/
16

17

18        Plaintiff Simi Management Corporation, d/b/a Connell Auto Center operated car dealerships.

19   After selling its last franchises in August 2007, Plaintiff discovered that its long-time chief financial

20   officer ("CFO") Roger Reichart had embezzled millions of dollars from the firm via its accounts

21   with Defendant Bank of America, N.A. ("BofA").  Plaintiff brought suit to recover damages from

22   the bank, asserting that BofA knowingly participated in Reichart's scheme.  BofA now moves

23   pursuant to Federal Rule of Civil Procedure 56 for summary judgment or, in the alternative, partial

24   summary judgment.  [Docket No. 36 ("Def.'s Mot.").]  Plaintiff opposes the motion.  [Docket No. 55

25   ("Pl.'s Opp'n").]  For the following reasons, the court grants the motion in part and denies it in part.

26

27

28

# I. Facts[1] and Background

## A. Plaintiff and BofA's Relationship

Plaintiff owned and operated automobile dealerships in Oakland, California.[2]   (Joint Statement of Undisputed Material Facts ("Jt. Stmt") 2.)  Between 1982 and 1994, Roger Reichart was Plaintiff's business manager and controller.  He served as CFO from 1994 through 2007.  (Jt. Stmt 2.)  As CFO, Reichart supervised Plaintiff's accounting department and exercised control over Plaintiff's finances and bank accounts.  (Wendlenner Decl. Ex. C (Simi Dep. at 34:18-35:3, 193:15-22, 196:12-13, 204:1-205:3).)

On August 1, 1994, based on Reichart's recommendation, (Simi Decl. ¶ 3), Plaintiff began its account relationship with BofA.  (Jt. Stmt 2.)  Plaintiff opened bank accounts at the Fremont, California office of BofA's Dealer Corporate Services division ("Dealer Services"), which provides specialized services to car dealerships.  Thereafter, Plaintiff conducted most of its banking transactions at BofA's Oakland Main Branch.  (Logan Decl Ex. E (Mausten Dep. at 14:3-16:3, 23:18-24:2, 21:1-18.)  BofA knew Reichart was Plaintiff's CFO.  (Jt. Stmt 2.)

One of the key disputed questions in this litigation is whether BofA had the authority to honor Plaintiff's checks that were signed by only one, as opposed to two, approved signatories.  The answer lies in part in the agreements between the parties.  The form and content of the original contracts governing the parties' banking relationship remain unclear.[3]  BofA produced three

---

[1] BofA makes several evidentiary objections to Plaintiff's submissions.  (*See* Def.'s Reply 1-2.) The court sustains BofA's objection to paragraph 5 of the Simi declaration to the extent it challenges Simi's subjective beliefs about the operation of the contracts between the parties.  Such statements are irrelevant.  (*See portions of* Simi Decl. ¶ 5).  The court also sustains BofA's objections to Simi's hearsay statement about Felicia Mananquil, (*see* Simi Decl. ¶ 12), pursuant to Federal Rule of Evidence 802. The court overrules all other objections or denies them as moot because the court did not rely on them in reaching its decisions in this order.

[2] In 1994, Plaintiff operated through two corporate entities:  Steve Simi Chevrolet, Inc. d/b/a Cochran & Celli, and Simi Management Corp. d/b/a Connell Auto Center.  (Simi Decl. ¶¶ 2-3.)  In 1999, Plaintiff sold the automobile franchises by Steve Simi Chevrolet, Inc. and merged Steve Simi Chevrolet, Inc. into Simi Management Corp.  (Simi Decl. ¶ 4.)

[3] In its opposition brief, Plaintiff raises several objections to the declaration of Roberta Lee. (*See* Pl.'s Opp'n 3, 19-20).  Plaintiff elaborated upon these objections in a separately filed document ("Lee Objections"), [Docket No. 68].  BofA moves to strike the Lee Objections as improperly filed in violation of the Court's local rules.  [Docket No. 69.]  Civil Local Rule 7-3(a) requires that "[a]ny evidentiary . . . objections to [a] motion be contained within the brief or memorandum."  N.D. Cal. Civ. L.R. 7-3(a).

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1  documents dating back to the 1994 opening of Plaintiff's accounts:  (1) a Funds Transfer Agreement,

2  (2) a Service Agreement concerning the Quick Business Deposit Service; and (3) a signature card

3  ("Original Signature Card").  (Logan Decl. ¶ 7; Mausten Dep. 41:3-22, 45:16-46:8; Lee Decl. Exs. A

4  (Funds Transfer Agreement), B (Service Agreement), C (Original Signature Card).)  The Funds

5  Transfer Agreement, executed by Reichart on July 22, 1994, "specifies who may act for [Plaintiff]"

6  under its terms.  (Lee Decl. Ex. A at 1.)  The agreement lists five individuals -- Steve Simi, Robert

7  Rubino, Reichart, Andrea Cabral, and Todd Simi -- as "authorized persons," "designated callers,"

8  and "verifiers."  (Lee Decl. Ex. A at 2.)  According to the agreement, Plaintiff "authorizes each

9  Authorized Person . . . , acting alone . . . [t]o give instructions orally . . . on [Plaintiff's] behalf to

10  Bank to initiate, amend, cancel or verify funds transfers from [Plaintiff's] accounts" "[i]n any

11  amount.  There is no limit."  (Lee Decl. Ex. A at 1-2.)  The Original Signature Card includes the

12  signatures of Reichart, Steve Simi, Todd Simi, Cabral and Rubino.  It bears the handwritten

13  statement, "2 Signatures Required," and a checked box for "New Account."  (Lee Decl. Ex. C;

14  Mausten Dep. 41:3-28, 45:16-46:8.)

15      Plaintiff contends that these documents governed its BofA accounts when they were

16  established.  Defendant asserts without evidence that a Master Agreement/Signature Card governed,

17  and that it incorporated a Corporate Deposit Agreement by reference.  Defendant further claims that

18  as of 1996, the Corporate Deposit Agreements, which Plaintiff accepted as binding when it

19  completed the Master Agreements, explicitly informed Plaintiff that the bank was not bound by any

---

21  If a party files objections in a separate document, the court will strike and disregard them.  *See, e.g.,*
22  *Ferretti v. Pfizer, Inc.*, No. 11-4486 LHK, 2013 WL 140088, at *1 n.1 (N.D. Cal. Jan. 10, 2013).  The
   court therefore strikes the Lee Objections from the record.  Nevertheless, the court will consider the
   evidentiary objections which Plaintiff included in its brief.  *See Lotes Co. v. Hon Hai Precision Indus.*
23  *Co.*, No. 11-1036 JSW, 2012 WL 2917450, at *1 n.1 (N.D. Cal. July 17, 2012.)

24      In its opposition, Plaintiff contends that the court should not consider various statements in the
   Lee Declaration because they lack foundation or personal knowledge. (Pl.'s Opp'n 3, 19-20.)
25  Specifically, Plaintiff argues that Lee cannot properly attest to what documents Plaintiff received when
   it opened its BofA accounts in 1994; whether Plaintiff executed a Master Agreement at that time;
26  whether this Master Agreement incorporated a Corporate Deposit Agreement; or whether Plaintiff
   received, let alone acceded to, a Corporate Deposit Agreement when it opened its accounts.  (Pl.'s
   Opp'n 3, 19-20.)  The court sustains Plaintiff's objections.  Nothing in the Lee Declaration establishes
27  that Lee has personal knowledge of Dealer Services's account formation practices, or how she knows
   what documents Plaintiff received and executed throughout the duration of its relationship with BofA.
28  Her testimony to this effect is inadmissible.  *See* Fed. R. Civ. P. 56(c)(4).

3

1  "indicat[ion] on [Plaintiff's] signature card or other account opening documents that more than one

2  signature is required for withdrawal." (Lee Decl. Ex. I.) Neither party has located an executed

3  Master Agreement dating from 1994. (Logan Decl. ¶ 4; Lee Decl. ¶ 5.) Further, Carmy Mausten,

4  head of Dealer Services from 1987 until March 2012, testified that he had never seen BofA's 1994

5  Corporate Deposit Agreement, and that Dealer Services provided its customers with a different

6  pamphlet. (Mausten Dep. 48:8-49:7.)

7      BofA maintains that the parties executed new Master Agreements in 1996 and 2000. (Lee

8  Decl. Exs. D-F).) The 1996 Master Agreement contains the following language:

9      You begin a deposit account relationship with us by giving us information about your
       business and by signing below. We enter the information on our computer system.
10     The written information we give you is part of this agreement and tells you the
       current terms of our deposit accounts. We may change these terms at any time. We
11     inform you of changes that affect your rights and obligations. You or we can end this
       banking relationship at any time.
12

13  (2d Lee Decl. Ex. A at 1.) The top of the reverse side of the document states that the "Bank may pay

14  out funds . . . with any one of the signatures below unless you specify another number here." (Lee

15  Decl. Ex. D; Supp Br. Ex. D; 2d Lee Decl. Ex. A at 2.) The space after the sentence for an alternate

16  number is blank, but the phrase "2 signatures required" is typed into the "Special Payment

17  Instructions" field. (Lee Decl. Ex. D; Supp Br. Ex. D.) The "Authorized Signature(s)" field

18  contains the signatures of Steve Simi, Rubino, Reichart, Cabral, and Todd Simi. (Lee Decl. Ex. D at

    1; Supp. Br. Ex. D at 1.)

19

20      The two 2000 Master Agreements begin, in relevant part, as follows:

21     You begin or continue a deposit account relationship with us by giving us
       information about your business and *by signing below*. The written information we
22     give you is part of your agreement with us and tells you the current terms of our
       deposit accounts. We may change the agreement at any time. We inform you of the
23     changes that affect your rights and obligations. You acknowledge receipt of the
       deposit agreement.

24  ((Lee Decl. Exs. E at 2, F at 2; Supp. Br. Exs. E at 2, F at 2) (emphasis added).) The signature

25  section for both documents is blank. (Lee Decl. Exs. E at 2, F at 2; Supp. Br. Exs. E at 2, F at 2.)

26  The reverse of the documents state that the "Bank may pay out funds on any one of the signatures

27  below." (Lee Decl. Ex. E at 1; Supp. Br. Ex. E at 1.) The "Authorized Signature(s)" field contains

28  the signatures of Steve Simi, Rubino, Reichart, Cabral, Todd Simi, and Mary Tejada. (Lee Decl.

United States District Court
For the Northern District of California

Exs. E at 1, F at 1; Supp. Br. Exs. E at 1, F at 1.)   Below the "Authorized Signature(s)" fields is the statement, "You agree that the written information we give you is part of your agreement with us and tells you the current terms of our deposit accounts."  (Lee Decl. Exs. E at 1, F at 1; Supp. Br. Exs. E at 1, F at 1.)

Plaintiff does not dispute the validity of the 1996 Master Agreement.  (*See* Pl.'s Opp'n 4.) However, Plaintiff challenges the validity of the two 2000 Master Agreements -- which appear to be dated April 6, 2000 -- because unlike the 1996 Master Agreement, these documents "were not filled in by [Plaintiff] and they were not executed by . . . anyone on behalf of [Plaintiff]."  (Pl.'s Opp'n 4 (citing Lee Decl. Exs. E, F[4]) (emphasis removed).)  Plaintiff also submitted an updated signature card dated April 6, 2000 which includes Mary Tejada as an authorized signatory, *see infra*, and has "Two Signatures Required" typed in its header.  (Logan Decl. Ex. F.)

According to Steve Simi, Plaintiff's President and Chief Executive Officer, since its inception in 1978, Plaintiff maintained a two-signature requirement on all company checks, a requirement that he communicated to BofA.  (Simi Decl. ¶ 5.)  All of Plaintiff's checks had dual signature lines.  (Kirwan Decl. ¶ 5.c.i.)  Reichart was one of several authorized signers on all of Plaintiff's BofA accounts between August 1, 1994 and October 1, 2007.  (Jt. Stmt 2; Simi Decl. ¶ 4.) Through late 1999, the other authorized signers were Steve Simi, Rubino, Cabral, and Todd Simi. (Simi Decl. ¶ 4.)  In January 2000, because Steve Simi worked at a different location than the other signers, and Plaintiff required two signatures to present a check on its BofA accounts, Mary Tejada, who worked at the same location as Steve Simi, also became an authorized signer.  (Simi Decl. ¶ 4.) On May 24, 2000, BofA faxed Plaintiff the images of three checks bearing only the signature of Andrea Cabral, with an accompanying stamp notation that "two signatures [are] required."  (Logan Decl. ¶ 9, Ex. G.)

From the inception of the parties' banking relationship, BofA mailed Plaintiff weekly checking account statements.  (Jt. Stmt 2.)  These statements contained images of the checks written on the accounts during the relevant weekly period.  In August 2005 the check images began arriving

---

[4] In its brief, Plaintiff cites to Exhibits G and H of the Lee Declaration to reference the 2000 Master Agreements.  (Pl.'s Opp'n 4.)  The court assumes this was a typographical error.

1   on CD ROM.  (Jt. Stmt 2.)  Plaintiff also received monthly analysis statements for each of its BofA

2   accounts.  (*Id.*)  BofA's monthly statements did not include copies of cashiers checks that had been

3   issued with Plaintiff's funds.  (Kirwan Decl. ¶ 5.l.)

4          After Plaintiff sold its last franchises in the latter half of 2007, Steve Simi began to discover

5   that Reichart had embezzled over $4 million from Plaintiff's BofA accounts under the Connell Auto

6   name from early November 2001 to October 2007.  (Jt. Stmt 2; Wendlenner Decl. Ex. B).  Reichart

7   had conducted his embezzlement transactions primarily at the Oakland Main Branch.  (Simi Decl. ¶

8   11.)  Before November 17, 2004, nearly all of Plaintiff's checks presented to BofA had two

9   signatures.  (Kirwan Decl. ¶ 5.c.i.)  After November 17, 2004, BofA began honoring checks which

10  bore only Reichart's signature.[5]  (Kirwan Decl. ¶ 5.c.i.)  On October 2, 2007, Steve Simi opened a

11  new BofA account, making himself the sole authorized signer on all of Plaintiff's accounts.  (Jt.

12  Stmt 2; Simi Decl. ¶¶ 5-6 (citing Lee Decl. Ex. T; Simi Decl. Ex. A (Lee Decl. Ex. T)).)

13         Prior to Steve Simi's discovery of Reichart's embezzlement, BofA never informed Steve

14  Simi that it had detected fraud in Plaintiff's accounts.  (Simi Decl. ¶ 10.)  Counting only the

15  transactions for which Plaintiff has full records,[6] BofA collected $498,792.70 in banking service fees

16  from Plaintiff during the course of Reichart's embezzlement scheme.  (Sevilla Decl. ¶ 7.)  On

17  September 29, 2011, the Alameda County Superior Court sentenced Reichart for grand theft and tax

18  evasion.  (Am. Compl. ¶ 1.)

19         **B. Banking and Business Practices, and Reichart's Embezzlement**

20         Plaintiff submitted the expert witness declaration of Christopher H. Kirwan, a consultant

21  who worked approximately thirty years in law enforcement, including twenty-three with the FBI,

22  and has eight years of anti-money laundering experience.  (Kirwan Decl. ¶¶ 1-2.)  From 2006 to

23  2009, he served as a Senior Vice President in BofA's Global Anti-Money Laundering Operations.

24

25         [5] Between 2005 and 2007, out of Plaintiff's  36,000 checks processed during that period,
    Plaintiff presented BofA with only 44 checks that were not related to Reichart's embezzlement scheme,
26  and that bore only one signature.  (Sevilla Decl. ¶ 5, Ex. A, Jan. 10, 2013; Lee Decl. Ex. U; Wendlenner
    Decl. Ex. D.)
27

28         [6] Plaintiff does not have complete account records for the months of March 2002, January and
    December 2004, January 2005, and August 2007.  (Sevilla Decl. ¶ 7.)

1   (Kirwan Decl. ¶ 2.)  According to Kirwan, BofA has internal procedures for identifying suspicious

2   banking activity, such as embezzlement and money laundering.  (Kirwan Decl. ¶ 4.)  For example,

3   BofA requires employees to report suspicious activity, and the bank undertakes extensive

4   computerized reviews of nearly all transaction activity to detect suspicious patterns and anomalies.

5   (Kirwan Decl. ¶ 4.)  When the bank encounters potentially suspicious activity, the transactions in

6   question and the related bank accounts, including their transactions histories, are referred for

7   intensive expert review.  (Kirwan Decl. ¶ 4.)  If the review confirms suspicion, the reviewing analyst

8   recommends whether BofA should close the accounts and whether it should report the activity to the

9   government and law enforcement.  (Kirwan Decl. ¶ 4.)

10      Kirwan also explained that business checks are accepted in most business transactions, and

11   the use of cashiers checks for business transactions is unusual.  (Kirwan Decl. ¶ 5.a.)  In line with

12   industry-wide automobile dealership practices, Plaintiff did not regularly pay its creditors using

13   cashiers checks.  (Simi Decl. ¶ 9.)  On rare occasions, though, it would purchase a BofA cashiers

14   check for legitimate dealership business.  (Simi Decl. ¶ 9.)  When drafting checks, businesses rarely

15   use "cash" as the payee, because it makes the use of the funds difficult to track for record keeping

16   purposes and increases the risk of loss if the check is stolen.  (Kirwan Decl. ¶ 5.c.iii.)

17      The following paragraphs describe some of the transactions which Reichart executed in his

18   embezzlement scheme. When he began to embezzle Plaintiff's funds, Reichart usually wrote checks

19   payable to "Bank of America, Lakeshore Drive, Oakland, CA" – the address of the Oakland Main

20   Branch[7] – and exchanged those checks for cash or cashiers checks.  (Kirwan Decl. ¶ 5.c.iii.)  From

21   October 5, 2005 onward, however, he made the checks payable to "cash" when exchanging them for

22   cashiers checks.  (Kirwan Decl. ¶ 5.c.iii.)  Reichart occasionally deposited the cash that he received

23   into the personal accounts of Lorraine Espiritu.  (Kirwan Decl. Exs. C, D.).  For example, over the

24   course of 17 transactions, he deposited $165,452 into her BofA Investment Services account.

25   (Kirwan Decl. ¶ 5.h.)

26

27   _____

28      [7] The Oakland Main Branch is on Lakeside Drive, not the nearby Lakeshore Drive.  (Kirwan
Decl. ¶ 5.c.iii.)  The reason for this discrepancy is unclear.

1    BofA issued 186 cashiers checks at Reichart's request, totaling $1,365,425, payable to

2    individuals who customarily would be expected to accept a business check when making a

3    transaction with a car dealer.  (Kirwan Decl. ¶ 5.d.)  Most of these individual payees received

4    multiple cashiers checks.  (Kirwan Decl. ¶ 5.d.)  For example, 56 cashiers checks were payable to

5    Paula Hale, Reichart's girlfriend, for a total of $352,180; 22 to Katrese Moore for $117,995; 16 to

6    Nehemiah Williams for $130,390; and 12 to Susan Shavers for $103,375.  (Kirwan Decl. ¶ 5.d.)  An

7    atypically high number of these cashiers checks payable to individuals were cashed out rather than

8    deposited into bank accounts.  (Kirwan Decl. ¶ 5.e.)

9    On 19 cashiers checks, Reichart had BofA identify the remitter, i.e. the purchaser, as

10   someone other than Plaintiff.  (Kirwan Decl. ¶ 5.f.)  When BofA issues cashiers checks, it imprints

11   the remitter at the time of issuance, which allows a check's recipient to identify the source of the

12   funds.  (Kirwin Decl. ¶ 5.f.)  However, when issuing cashiers checks for Reichart that were

13   purchased with Plaintiff's funds, BofA listed Paula Hale as the remitter nine times, Lorraine Espiritu

14   seven times, and "Jamalian" or Roger Reichart twice.  (Kirwin Decl. ¶ 5.f.)  The sum value of these

15   checks was $217,878.  (Kirwin Decl.¶ 5.f.)  From March 2004 through February 2005, at Reichart's

16   request, BofA issued $29,718.76 in cashiers checks payable to Perchak Properties, and incorrectly

17   listed Reichart as the remitter.  (Kirwin Decl. ¶ 5.g.)  Each check was deposited into Perchak

18   Properties' own BofA account.  (Kirwin Decl. ¶ 5.g.)  One of these checks bore the handwritten

19   notation "5353 Crystal Ranch Dr., Concord, CA," and five others had the notation "Crystal Ranch."

20   (Kirwin Decl. ¶ 5.g.)  According to lease records, 5353 Crystal Ranch Drive was leased to Reichart

21   and Paula Hale.  (Kirwin Decl. ¶ 5.g.)

22   Many of the cashiers checks that Reichart purchased with Plaintiff's funds had payees that

23   would not be expected for a car dealership business.  (Kirwan Decl. ¶ 5.b.)  For example, 111

24   cashiers checks, for a sum of $650,532.92, were payable to Neiman Marcus, usually against

25   Reichart's personal Neiman Marcus account; four checks, totaling $26,800, went to Saks Fifth

26   Avenue; nine cashiers checks, for a total of $53,803.35, were payable to interior design and home

27   furnishing companies; seven checks went to Mercedes Benz Financial, paid against an account in

28   Reichart's name and in amounts more consistent with monthly payments than payoffs; five checks,

United States District Court
For the Northern District of California

worth $47,895, had a title company as payee; four, totaling $19,000, went to home mortgage companies; and three cashiers checks, together worth over $20,000, were payable to jewelers.[8] (Kirwan Decl. ¶¶ 5.b, 5.k.i, iii, xii.)  Thirty-two other cashiers checks, totaling $226,365, were routed through six different payees to the Wells Fargo Bank account of B.G. International Gems in a manner that disguised the amount of funds transferred and concealed the source of the funds from Wells Fargo.  (Kirwan Decl. ¶ 5.j.)  BofA exchanged Plaintiff's checks for cashiers checks payable to American Express 52 times, each of which was paid against Lorraine Espiritu's personal American Express account, for a total of $155,000.  (Kirwan Decl. ¶ 5.k.iv.)  BofA exchanged Plaintiff's checks for cashiers checks payable to First USA (later Bank One and Chase Bank) on 62 occasions, all of which were paid against one of Espiritu's VISA card accounts, for a sum of $127,000.  (Kirwan Decl. ¶ 5.k.v.)  BofA also issued 17 cashiers checks, together worth over $37,867 and payable to VISA, which were paid against another of Espiritu's VISA accounts. (Kirwan Decl. ¶ 5.k.vii.)  On 20 occasions, BofA issued cashiers checks, for a total of almost $40,000, payable to Sea West FCU, which were credited to Espiritu's personal accounts.  (Kirwan Decl. ¶ 5.k.vi.)  BofA issued four cashiers checks, in total worth nearly $21,000, payable to Aurora Bank/Aurora Finance, which were paid against Espiritu's personal account.  (Kirwan Decl. ¶ 5.k.viii.)  Similarly, BofA exchanged Plaintiff's checks for cashiers checks payable to World Bank on 20 occasions, for a total of $89,000.  (Kirwan Decl. ¶ 5.k.x.)  At least 15 of these cashiers checks were paid against a loan account held by Paula Hale.  (Kirwan Decl. ¶ 5.k.x.)  BofA also issued 21 cashiers checks, worth $96,000 and payable to MasterCard Providian, which were paid against Paula Hale's personal account.  (Kirwan Decl.  ¶ 5.k.xi.)

Many of Reichart's embezzlement transactions bear hallmarks of structuring transactions in increments below $10,000 to evade money laundering reporting.  (Kirwan Decl. ¶ 5.i.i.)  For example, on October 27, 2005, Reichart presented BofA with two of Plaintiff's checks, each worth $8000, and exchanged them for two cashiers checks worth $8000 each, payable to Adam Taylor and Nehemiah Williams, respectively.  (Kirwan Decl. ¶ 5.i.i.)  The following day, the same BofA teller

---

[8] The high value, portability, and fungible nature of gems and precious metals make jewelry a favorite means of laundering money.  (Kirwan Decl. ¶ 5.j.)

United States District Court

For the Northern District of California

that performed these transactions cashed out the cashiers checks, paying out a total of $16,000 in cash to Taylor and Williams in consecutive transactions that occurred within a minute of each other. (Kirwin Decl. ¶ 5.i.i.) On August 7, 2006, BofA issued Reichart a cashiers check payable to Neiman Marcus for $24,594 in exchange for one of Plaintiff's checks for an identical sum. (Kirwin Decl. ¶ 5.i.ii.) Two days later, BofA exchanged the cashiers check for three separate cashiers checks, all payable to Neiman Marcus, in the amounts of $8,000, $8,000, and $8,594. (Kirwin Decl. ¶ 5.i.ii.) Between September 18 and 25, 2006, BofA exchanged Plaintiff's checks for three cashiers checks, each in an amount below $10,000.[9] (Kirwin Decl. ¶ 5.i.iii.) Between September 27 and October 10, 2006, Reichart exchanged Plaintiff's checks for seven cashiers checks, each with an amount below $10,000, totaling $66,170.[10] (Kirwin Decl. ¶ 5.i.iv.)

Plaintiff never authorized Reichart to draw company checks for payment that bore only his signature; to alter, or caused to be altered, the remitter line on cashiers checks purchased with Plaintiff's monies; to withdraw cash from Plaintiff's accounts and deposit those cash proceeds into the bank accounts of others; or to use Plaintiff's monies for his personal use or for the use of anyone other than Plaintiff. (Simi Decl. ¶ 14.)

## II. Procedural History

Plaintiff first filed suit against BofA in California state court on April 18, 2008. (Notice of Removal ¶ 23.) The case was dismissed without prejudice in March 2010 pursuant to a tolling agreement between the parties. (Notice of Removal ¶ 23.) Plaintiff filed the present case on October 18, 2011, alleging (1) aiding and abetting conversion and embezzlement, (2) aiding and abetting breach of fiduciary duty, and (3) breach of contract. [*See* Docket No. 1.] BofA removed the case to federal court on the basis of diversity jurisdiction on November 17, 2011. [*See* Docket No. 1.] On November 23, 2011, BofA moved to dismiss the complaint for failure to state a claim. [Docket No. 6.] The court granted the motion in part and denied it in part. *Simi Mgmt. Corp. v.*

---

[9] Although two of these checks were payable to Susan Shavers, and one to Paula Hale, all were endorsed, "Paula Hale payable to Don Franko." (Kirwin Decl. ¶ 5.i.iii.)

[10] Five of these cashiers checks were payable to Placer Title Co., and one to Susan Shavers and Paula Hale each. (Kirwin Decl. ¶ 5.i.iv.) All of the checks were transferred to the credit of Placer Title Co. (Kirwin Decl. ¶ 5.i.iv.)

United States District Court

For the Northern District of California

1   *Bank of Am., N.A.*, No. 11-5573-DMR, 2012 WL 259865 (N.D. Cal. Jan. 27, 2012). The court

2   dismissed Plaintiff's aiding and abetting claims with leave to amend because "Plaintiff ha[d] not

3   adequately alleged that BofA had actual knowledge of Reichart's embezzlement and conversion or

4   his specific breach of fiduciary duty." *Id.* at *4. The court declined to dismiss Plaintiff's breach of

5   contract claim. *Id.* at *6.

6         Plaintiff filed its Amended Complaint on March 29, 2012, bringing the same claims.

7   [Docket No. 22.] In its first claim, Plaintiff now alleges that BofA had "actual knowledge that

8   Reichart was converting and embezzling [Plaintiff]'s monies in [Plaintiff's BofA] bank accounts"

9   and "knowingly assisted, cooperated with and/or lent aid and encouragement" to Reichart. (Am.

10  Compl. ¶ 25.) In the alternative, Plaintiff maintains that BofA provided Reichart with "substantial

11  assistance" in his embezzlement and conversion, and in the process, breached its duty to Plaintiff "to

12  pay only those items that were actually authorized by [Plaintiff], as well as the duty to use

13  reasonable care when paying items presented in [Plaintiff]'s accounts and when debiting [Plaintiff]'s

14  accounts." (Am. Compl. ¶ 26.) Plaintiff also asserts that BofA breached its duties to Plaintiff "to

15  account for all transactions in connection with its [BofA] bank accounts and to render accurate

16  statements." (Am. Compl. ¶ 26.) In its second claim, for aiding and abetting breach of fiduciary

17  duty, Plaintiff now alleges that BofA "had actual knowledge" that Reichart was breaching his

18  fiduciary duties to Plaintiff and "knowingly assisted, cooperated with and/or lent aid an

19  encouragement" to Reichart. (Am. Compl. ¶ 32.) In the alternative, Plaintiff maintains that BofA

20  provided Reichart with "substantial assistance" in breaching his fiduciary duties to Plaintiff and, in

21  the process, breached its duty to Plaintiff "to pay only those items that were actually authorized by

22  [Plaintiff], as well as the duty to use reasonable care when paying items presented in [Plaintiff]'s

23  accounts and when debiting [Plaintiff]'s accounts." (Am. Compl. ¶ 33.) Plaintiff also asserts that

24  BofA also breached its duties to Plaintiff "to account for all transactions in connection with its

25  [BofA] bank accounts and to render accurate statements." (Am. Compl. ¶ 33.) Plaintiff's final

26  claim alleges that BofA breached the contract between the parties (1) by paying items presented on

27  Plaintiff's accounts bearing only one signature; (2) by not providing Plaintiff with "copies of

28  cancelled checks and other paper items paid against [Plaintiff]'s accounts, including copies of the

United States District Court

For the Northern District of California

1   cashiers checks paid for with [Plaintiff]'s monies, after Plaintiff made repeated requests" to BofA;

2   and (3) by "destroying some of [Plaintiff]'s banking records after [BofA] was put on notice of the

3   embezzlement and while [Plaintiff]'s request for some of those items remained outstanding." (Am.

4   Compl. ¶ 43; *see* Am. Compl. ¶¶ 41-42.)

5       On April 16, 2012, BofA again moved to dismiss for failure to state a claim. [Docket No.

6   23.] The court denied the motion. *Simi Mgmt. Corp. v. Bank of Am., N.A.*, No. 11-5573-DMR, 2012

7   WL 1997232 (N.D. Cal. June 4, 2012). BofA now moves for summary judgment. [Docket No. 36.]

8   In its moving brief, BofA sets forth three overarching arguments: that Plaintiff cannot muster facts to

9   prove its aiding and abetting claims; that Plaintiff cannot establish that BofA breached the contract

10  between the parties; and that Plaintiff's claims are time barred.

### III. Legal Standard

12      A court shall grant summary judgment "if . . . there is no genuine issue as to any material

13  fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of

14  establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex*

15  *Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light

16  most favorable to the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)

17  (citation omitted). A moving party may meet this burden by "'showing . . . that there is an absence

18  of evidence to support the nonmoving party's case.'" *Fairbank v. Wunderman Cato Johnson*, 212

19  F.3d 528, 531 (9th Cir. 2000) (quoting *Celotex Corp.*, 477 U.S. at 325) (quotation marks omitted).

20  A genuine factual issue exists if, taking into account the burdens of production and proof that would

21  be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could

22  return a verdict in that party's favor. *Anderson*, 477 U.S. at 248. The court may not weigh the

23  evidence, assess the credibility of witnesses, or resolve issues of fact. *See id.* at 249.

24      To defeat summary judgment once the moving part has met its burden, the nonmoving party

25  may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit

26  or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a genuine

27  issue of material fact exists. *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630

28  (9th Cir. 1987). In other words, there must exist more than "a scintilla of evidence" to support the

United States District Court

For the Northern District of California

1  non-moving party's claims, *Anderson*, 477 U.S. at 252; conclusory assertions will not suffice.  *See*

2  *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  Similarly, "[w]hen opposing

3  parties tell two different stories, one of which is blatantly contradicted by the record, so that no

4  reasonable jury could believe it, a court should not adopt that version of the facts" when ruling on

5  the motion.  *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007).

6  ### IV. Discussion

7  ### A. Statute of Limitations and Issue Preclusion

8  #### 1. BofA's Argument

9  Because the outcome of BofA's statute of limitations and issue preclusion arguments affects

10  the disposition of the remainder of this motion, the court addresses these issues first.  BofA contends

11  that Plaintiff's claims, which stem from Reichart's misuse of checks on Plaintiff's accounts, are

12  time-barred by the one-year statute of limitations under California Civil Procedure Code § 340(c)

13  and precluded by California Commercial Code § 4406(f).

14  #### 2. Applicable Law

15  California Code Civil Proc. § 340(c) provides a one-year statute of limitations to file "[a]n

16  action . . . by a depositor against a bank for the payment of a forged or raised check, or a check that

17  bears a forged or unauthorized endorsement."  § 340(c); *see also Chatsky & Assocs. v. Super. Ct.*,

18  117 Cal. App. 4th 873, 875 (2004) (holding that § 340(c), rather than the three-year statute of

19  limitations in California Commercial Code § 4111 applies to "claims by depositors against their

20  bank for payment of forged checks written on the depositors' accounts").  The limitation applies

21  "independently with respect to each forged check and begins to run when the charge is reported to

22  the depositor in a regular monthly account statement."  *Chatsky & Assocs.*, 117 Cal. App. 4th at 877

23  (citing *Roy Supply, Inc. v. Wells Fargo Bank, N.A.*, 39 Cal. App. 4th 1051, 1074 (1995)).  The one

24  year statute of limitations "begins to run from the time the alleged 'forged or raised' check was

25  delivered to the depositor."  *Union Tool Co. v. Farmers & Merchants Nat. Bk. of Los Angeles*, 192

26  Cal. 40, 52-53 (1923).

27  California Commercial Code § 4406 requires that banks which provide customers with

28  account statements that "show[] payment of items," must return or make available to the customer

**United States District Court**
For the Northern District of California

the items paid or to provide information in the statement "sufficient to allow the customer

reasonably to identify the items paid." Cal. Comm. Code § 4406(a). A statement of account

provides "sufficient information if the item is described by item number, amount, and date of

payment." *Id.* Once the item or statement in compliance with subsection (a) is available to the

customer, "[w]ithout regard to care or lack of care of either the customer or the bank," "a customer

who does not within one year after the statement or items are made available . . . discover and report

the . . . unauthorized signature on . . . the item is precluded from asserting against the bank the

unauthorized signature." § 4406(f); *accord Chatsky & Assocs.*, 117 Cal. App. 4th at 877; *Roy*

*Supply, Inc.*, 39 Cal. App. 4th at 1064 and n.13.

When a bank statement is deemed to have been "made available" to a customer under section

4406(f) is unclear. In *Kiernan v. Union Bank,* a California appellate court interpreted section 4406

to mean that a statement is "made available" upon deposit in the mail with appropriate postage. 55

Cal. App. 3d at 114 (citations omitted). However, as noted above, the California Supreme Court has

clearly stated that the statute of limitations provided in Cal. Code Civil Proc. § 340(c) begins to run

when the alleged forged check is delivered to the depositor. *Union Tool Co.*, 192 Cal. 40, 52-53. As

recognized by another California appellate court, the Legislature adopted California Commercial

Code section 4406 with the intent that its notification period should coincide with the statute of

limitations in subsection 340(c). *Roy,* 39 Cal. App. 4th at 1065, n.15, 1073-1074, n.25 ("[T]he

period within which the customer must act under section 4406 . . . begins to run at the same time the

statute of limitations contained in Code of Civil Procedure section 340 . . . begins to run.") *See also*

*Mac v. Bank of Am.*, 76 Cal. App. 4th 562, 567 (1999) (summarizing disharmony in California case

law regarding what event triggers notification period under section 4406). In interpreting California

state law, this court is "bound by decisions of the state's highest court." *In re Bartoni-Corsi*

*Produce, Inc.*, 130 F.3d 857, 861 (9th Cir. 1997). In the absence of a decision on point by the state's

highest court, this court "must predict how the highest state court would decide the issue using

intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and

restatements as guidance." *Id.* Because the California Legislature intended subsection 340(c) and

section 4406 to operate in tandem, the California Supreme Court would likely determine that a

United States District Court

For the Northern District of California

statement is "made available" under section 4406 at the same time the statute of limitations in subsection 340(c) begins to run; namely, upon the *receipt* of the statement.

Under California law, "'[u]nauthorized signature' means a signature made without actual, implied, or apparent authority. The term includes a forgery." Cal. Comm. Code § 1201(b)(42). Moreover, "[i]f the signature of more than one person is required to constitute the authorized signature of an organization, the signature of the organization is unauthorized if one of the required signatures is lacking." Cal. Comm. Code § 3403(b). Thus, Section 4406(f), which governs checks with "unauthorized signatures," applies where a bank honors checks lacking one of two required signatures.[11] *Edward Fineman Co. v. Super. Ct. of L.A. Cnty.*, 66 Cal. App. 4th 1110, 1117 (1998) ("[C]hecks lacking . . . a second required signature fall within the classification of items that must be discovered and reported pursuant to section 4406, subdivision (f) . . . . within the prescribed one-year period.").

Although it appears that no California courts have directly addressed the issue, numerous courts addressing other states' versions of section 4406(f) have held that a bank customer's report of an unauthorized signature (1) need not be in writing and (2) must alert the bank to the specific checks bearing the unauthorized signature; "a customer may not simply state a nebulous belief of foul play." *Envtl. Equip. & Service Co. v. Wachovia Bank, N.A.*, 741 F. Supp. 2d 705, 720 (E.D. Pa. 2010) ("[G]eneral notice to the payor bank that a theft has, or might have, occurred is not specific 'notice' under section 4-406. Rather, specific notice of specific items that are forged or altered is required." (brackets in original) (citation and quotation marks omitted)) (citations omitted). *Accord Hatcher Cleaning Co. v. Comerica Bank -- Tex.*, 995 S.W.2d 933, 938 (Tex. Ct. App. 1999) ("[B]oth the check and the account should be specifically identified. General references to a possible [crime] are not sufficient 'reports' or 'items' under former section 4.406."); *Robinson Motor Xpress, Inc. v.*

---

[11] Section 340(c), which imposes a one-year statute of limitations only for causes of action by "a depositor against a bank for the payment of a forged or raised check, or a check that bears a forged or unauthorized endorsement" does not apply in such situations. Cal. Code Civ. Proc. § 340(c); *Hughes Electronics Corp. et al v. Citibank Delaware et al*, 120 Cal. App. 4th 251, 270 n.17 ("[*Fineman*] involved a bank's unauthorized payment of checks which required two signatures, but which were presented with only one. The applicability of 340(c) was not raised, nor would that statute have applied. The check at issue was not "forged" or "raised" and did not bear a "forged or unauthorized endorsement") and 270 (calling section 340(c) a "special, narrow, and specific statute").

1    *HSBC Bank, USA*, 37 A.D.3d 117, 123 (N.Y. App. Div. 2006) ("[T]he critical element of the notice

2    is not its form, but the specificity with which it identifies the allegedly fraudulent items.") (citations

3    omitted); *Knight Commc'ns, Inc. v. Boatmen's Nat'l Bank of St. Louis*, 805 S.W.2d 199, 203-04

4    (Mo. Ct. App. 1991).  The court finds this reasoning persuasive.

5          As discussed above, if a court finds that section 4406(f) applies to a claim, unless the

6    plaintiff customer gave timely notice of an unauthorized signature, the plaintiff may not assert the

7    unauthorized signature against the bank more than one year after the customer received the

8    respective account statement.  "The effect this will have on a customer's claim against the bank will

9    depend upon whether proof of the [unauthorized signature] is an essential element of the particular

10   claim asserted." *Roy Supply, Inc.*, 39 Cal. App. 4th at 1066.   ("In essence, if a customer must prove

11   [an unauthorized signature] in order to establish a claim then the customer will not be able to

12   establish the claim because he or she is precluded from proving the [unauthorized signature].  On the

13   other hand, any claim that is not dependent upon proof of the [unauthorized signature] will not be

14   precluded by section 4406 . . . , although the customer will still be precluded from asserting the

15   [unauthorized signature] in pursing that claim.")

16          **3. Discussion**

17          Plaintiff's aiding and abetting causes of action, and a substantial portion of its breach of

18   contract claim,[12] stem from Reichart's embezzlement of funds by writing checks on Plaintiff's BofA

19   accounts.  In some instances, he signed his own signature, and allegedly forged a second one.  In

20   other instances, he submitted checks for payment with his own single signature.  The applicability of

21   subsection 340(c) to this subset of Plaintiff's claims thus turns on whether these checks were

22   "forged."  The checks bearing two signatures -- Reichart's signature plus an alleged forged signature

23   -- are subject to subsection 340(c)'s period of limitations.  Plaintiff's claims are time-barred to the

24   _____

25   [12] In its Amended Complaint, Plaintiff bases its breach of contract claim on three allegations:
     that BofA (1) breached the parties' agreement by paying items presented by Reichart that were not
26   properly payable; (2) did not provide Plaintiff with copies of cancelled checks and other paper items
     paid against its accounts, including copies of the cashiers checks paid for with Plaintiff's monies, as
27   requested; and (3) destroyed some of Plaintiff's banking records after BofA was put on notice of
     Reichart's embezzlement. (Am. Compl. ¶ 43.)  The first of these allegations is dependent on Reichart's
28   writing checks on Plaintiff's BofA accounts.  BofA does not challenge the other two allegations in this
     motion; the court therefore does not address thosse aspects of Plaintiff's breach of contract claim.

**United States District Court**
For the Northern District of California

1   extent they arise from forged checks reported in a statement received by Plaintiff more than one year

2   before the filing of Plaintiff's original complaint on April 18, 2008 – i.e., before April 18, 2007.

3   This statute of limitations does not apply to the checks that Reichart negotiated with only one

4   signature, however.  Although these checks may have been unauthorized, *see* Cal. Comm. Code §

5   1201(b)(41),[13] neither party argues, and the court finds nothing to indicate, that they were forged.

6   The court therefore proceeds to examine Plaintiff's claims under section 4406.

7           The parties do not dispute that, during the course of Reichart's embezzlement, BofA mailed

8   Plaintiff weekly account statements with the images of the checks processed on Plaintiff's accounts.

9   (Jt. Stmt 2.)  BofA's account statements therefore satisfied the statement reporting requirements of

10   section 4406(a) and triggered the one-year period during which Plaintiff had to report individual

11   checks bearing unauthorized signatures to BofA to avoid issue preclusion.  *See* § 4406(a), (f).  With

12   one exception, nothing in the record indicates that Plaintiff provided BofA with specific notice of

13   unauthorized checks prior to the filing of the original complaint on April 18, 2008.  Therefore,

14   Plaintiff may not base its claims upon, or offer as evidence, any check with an unauthorized

15   signature if the check appeared on a bank statement it received prior to April 18, 2007.  The

16   exception relates to a group of checks identified by Plaintiff in a November 10, 2007 notification

17   letter sent by Steve Simi to Kathy Cruz at BofA's Oakland Main Branch.  (Simi Decl. Ex. B.)

18   Simi's letter says "I am enclosing herein copies of the unauthorized 2007 checks that were cashed

19   by your branch.  Since all of these checks had only one signature and almost all of the payments

20   were made to highly suspect vendors (Neiman Marcus, Sak's etc.), it is unclear to me why your

21   branch cashed these checks."  (*Id.*)  Plaintiff did not submit copies of the checks that were

22   referenced as being enclosed with the letter.  If Plaintiff is able to establish exactly which checks

23   were provided to BofA as part of the letter, Plaintiff may offer as evidence of those unauthorized

24   checks specifically identified in the November 10, 2007 letter, as long as they did not appear on

25   bank statements received by Plaintiff before November 10, 2006.

26           **B. Breach of Contract**

27   _____

28           [13] "'Unauthorized signature' means a signature made without actual, implied, or apparent
authority."  Cal. Comm. Code § 1201(b)(41).

### 1. BofA's Argument

BofA contends that Plaintiff's breach of contract claim must fail because Reichart was an authorized signatory on Plaintiff's accounts, and the contract between the parties permitted BofA to process checks on Plaintiff's account when the checks bore only one signature. BofA asserts that when Plaintiff opened its accounts in 1994, Plaintiff executed a Master Agreement/Signature Card, which in turn incorporated a Corporate Deposit Agreement. (BofA's Mot. 11 (citing Jt. Stmt ¶ 5).) According to BofA, this agreement listed Reichart as an authorized signatory. BofA asserts that in 1996 and 2000, Plaintiff executed new Master Agreements/Signature Cards, which also listed Reichart as an authorized signatory. (BofA's Mot. 11 (citing Lee Decl. Exs. D-F).) Moreover, BofA avers that as of 1996, the Corporate Deposit Agreements, which Plaintiff accepted as binding when it completed the Master Agreements, explicitly informed Plaintiff that the bank was not bound by any "indicat[ion] on [Plaintiff's] signature card or other account opening documents that more than one signature is required for withdrawal." (BofA's Mot. 12 (quoting Lee Decl. Ex. I).) Consequently, BofA argues that it had an obligation to honor Reichart's banking requests, including his use of Plaintiff's checks bearing only his signature. (BofA's Mot. 11-12.) BofA therefore could not have breached its contract with Plaintiff when it abided by Reichart's requests.

Assuming *arguendo* that the Corporate Deposit Agreements' single signature provisions did not bind Plaintiff, BofA argues that "Plaintiff followed a one-signature protocol in its normal course of dealing." (BofA's Mot. 13.) Specifically, BofA highlights the "numerous" checks with one signature that Plaintiff used for legitimate transactions. (BofA's Mot. 14 (citing Lee Decl. Ex. U; Wendlenner Decl. Ex. D).) According to BofA, this course of dealing supplements the particular terms of the contract between the parties and provides a basis for understanding its meaning. (BofA's Mot. 13-14.)

### 2. Discussion

BofA's argument hinges on whether Reichart was a sole authorized signatory during the time he embezzled Plaintiff's funds. However, the court cannot determine from the evidence before it whether the parties' contract permitted Reichart to withdraw Plaintiff's funds without obtaining a second authorized signature. The terms of the original 1994 contract are unclear. Plaintiff asserts

18

United States District Court
For the Northern District of California

1    that the Funds Transfer Agreement, Service Agreement, and Original Signature Card formed the

2    basis of the parties' agreement.  (Pl.'s Opp'n. 2-3.)  BofA, however, contends that a Master

3    Agreement/Signature Card governed, and incorporated the Corporate Deposit Agreement by

4    reference.  (BofA's Mot. 11.)  Neither party has produced a Master Agreement/Signature Card from

5    1994.  (Logan Decl. ¶ 4; Lee Decl. ¶ 4.)  Moreover, no evidence suggests that BofA provided

6    Plaintiff with the Corporate Deposit Agreement at that time, much less identifies a particular

7    Corporate Deposit Agreement that was incorporated by reference in the alleged Master

8    Agreement/Signature Card.  In fact, evidence on the record suggests that BofA's Dealer Services did

9    not use the Corporate Deposit Agreement when opening customer accounts in 1994.  (Mausten Dep.

10   48:8-49:7.)

11        Turning to the 1996 Master Agreement/Signature Card, although both parties recognize its

12   legitimacy, (Lee Decl. ¶ 7; Pl.'s Opp'n 4), the signatory provisions of the contract remain elusive.

13   On its face, the document states that "2 [s]ignatures [are] required" for BofA to pay out funds from

14   Plaintiff's accounts.  (Lee Decl. Ex. D at 1; 2d Lee Decl. Ex. D at 1; Supp. Br. Ex. D at 1.)

15   Nevertheless, BofA again insists that a Corporate Deposit Agreement, incorporated by reference by

16   the Master Agreement, provided that BofA was not bound by any "indicat[ion] on [Plaintiff's]

17   signature card . . . that more than one signature is required for withdrawal."  (BofA's Mot. 12

18   (quoting Lee Decl. Ex. I).)  According to BofA, from 1996 onward, Reichart therefore had authority

19   to withdraw funds from Plaintiff's accounts using his signature alone on Plaintiff's checks.  As

20   noted above, nothing in the record indicates that Plaintiff received a Corporate Deposit Agreement

21   when it completed the 1996 Master Agreement/Signature Card, let alone that the Corporate Deposit

22   Agreement was the document incorporated by reference.  Whether the 1996 contract authorized

23   Reichart to make withdrawals with Plaintiff's checks using his signature alone remains disputed.

24        The two 2000 Master Agreements/Signature Cards are also problematic.  Unlike their 1996

25   counterpart, these documents contain no language about two signatures being required to withdraw

26   money from Plaintiff's accounts, and they explicitly state that BofA "may pay out funds to *any one*"

27   of the authorized signatories, which included Reichart.  (Lee Decl. Exs. E at 1 (emphasis added), F

28   at 1 (emphasis added); Supp. Br. Exs. E at 1 (emphasis added), F at 1 (emphasis added).)  Like the

United States District Court

For the Northern District of California

1    1996 Master Agreement/Signature Card, the 2000 documents purport to incorporate by reference a

2    "deposit agreement" binding on the signer.  (Lee Decl. Exs. E at 2, F at 2; Supp. Br. Exs. E at 2, F at

3    2.)  However, as stated before, no record evidence shows that Plaintiff received the Corporate

4    Deposit Agreement, which contains language permitting BofA to dispense customer funds to any

5    single authorized signatory on an account.  Likewise, nothing indicates that the Corporate Deposit

6    Agreement submitted by Defendant was the document incorporated by reference in the 2000 forms.

7    Perhaps most importantly, the 2000 documents explicitly require the non-bank party to sign them for

8    them to become operative.  (*See* Lee Decl. Exs. E at 2, F at 2; Supp. Br. Exs. E at 2, F at 2.)  The

9    documents, however, are unsigned.  In these circumstances, the court cannot find as a matter of law

10   that the 2000 Master Agreements/Signature Cards formed a contract between the parties.[14]

11           Evidence also does not conclusively support BofA's argument that, irrespective of the

12   written agreement between the parties, the normal course of dealing permitted BofA to pay out funds

13   from Plaintiff's accounts when presented with a check bearing one signature.  Under California law,

14   the terms of a written contract "may be explained or supplemented by course of dealing or . . . by

15   course of performance."  Cal. Civ. Proc. Code § 1856(c).  "Course of dealing" is defined as "a

16   sequence of previous conduct between the parties to a particular transaction which is fairly to be

17   regarded as establishing a common basis of understanding for interpreting their expressions and

18   other conduct."  *In re CFLC, Inc.*, 166 F.3d 1012, 1017 (9th Cir. 1999) (emphasis added) (citation

19   and quotation marks omitted).  Course of dealing evidence "may supplement" a contract "by

20   providing evidence of the parties' intentions."  *Id.*  "An inference of the parties' common knowledge

21   or understanding that is based upon a prior course of dealing is a question of fact."  *Id.* (citation

22   omitted).

23           To support its course of dealing argument, BofA notes that between 2005 and 2007, Plaintiff

24   presented the bank with 44 company checks bearing only one signature that were not related to

25   _____

26           [14] Although Plaintiff states that Mary Tejada became an authorized signatory on its accounts in
     early 2000, (Simi Decl. ¶ 4), this fact alone does not lead to the conclusion that the 2000 Master

27   Agreements/Signature Cards are valid, as BofA seems to suggest.  Plaintiff has produced a
     contemporaneous updated signature card which includes Tejada as an authorized signatory. (Logan

28   Decl. Ex. F.)  This signature card has the phrase "Two Signatures Required" typed in its header. (Logan
     Decl. Ex. F.)

United States District Court

For the Northern District of California

1 Reichart's embezzlement scheme. (BofA's Mot. 14 (citing Lee Decl. Ex. U; Wendlenner Decl. Ex.

2 D).) Given that Plaintiff drew over 36,000 checks during this period, (*see* Sevilla Decl. ¶ 5), the

3 court does not find that these 44 single-signature checks conclusively establish that the parties

4 operated under an understanding that BofA should honor Plaintiff's checks even if they bore one

5 signature. Moreover, as late as May 24, 2000 -- well after BofA contends that the one-signature

6 policy had taken effect between the parties -- BofA appears to have honored the dual signature

7 requirement when it faxed Plaintiff the images of three checks, which had only the signature of

8 Andrea Cabral, with an accompanying stamp notation that "two signatures [are] required." (Logan

9 Decl. ¶ 9, Ex. G.)

10         From the evidence currently before it, the court finds a genuine dispute of material fact as to

11 whether the contract between the parties during Reichart's embezzlement scheme authorized BofA

12 to honor checks on Plaintiff's account bearing only one authorized signature. Because this fact is

13 central to Plaintiff's breach of contract claim, the court must deny BofA summary judgment on this

14 count.

15         Nevertheless, some portion of Plaintiff's breach of contract claim must fail as a matter of

16 law, due to the impact of subsection 340(c)'s time bar for forged checks, as well as Section 4406(f)

17 claim preclusion, discussed above, as set forth above.

18    **C.    Aiding and Abetting Embezzlement and Conversion, and Aiding and Abetting
             Breach of Fiduciary Duty**

19

20                      **1.    Applicable Law**

21         Under California law, liability for aiding and abetting the commission of an intentional tort

22 may attach in two ways: if a defendant (1) "'knows the other's conduct constitutes a breach of duty

23 and gives substantial assistance or encouragement to the other to so act'" ("Method 1") or (2)

24 "'gives substantial assistance to the other in accomplishing a tortious result and the [entity]'s own

25 conduct, separately considered, constitutes a breach of duty to the third person'" ("Method 2").

26 *Seaman v. Sedgwick, LLP*, No. 11-664, 2012 WL 254046, at *7 (C.D. Cal. Jan. 26, 2012) (quoting

27 *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1144 (2005)). The first of these two

28 methods of proof requires that the defendant "have actual knowledge of the specific primary wrong

the defendant substantially assisted." *In re First Alliance Mortg. Co.*, 471 F.3d 977, 993 (9th Cir. 2006) (*citing Casey*, 127 Cal. App. 4th at 1146). That a defendant had "vague suspicion of wrong doing" or knew of "wrongful or illegal conduct" does not suffice. *In re First Alliance Mortg. Co.*, 471 F.3d at 993 n.4 (citation and quotation marks omitted); *see Casey*, 127 Cal. App. 4th at 1151-52. A plaintiff may prove actual knowledge through inference or circumstantial evidence. *See Bowoto v. Chevron Corp.*, No. 99-2506 SI, 2007 WL 2349336, at *15 (N.D. Cal. Aug. 14, 2007); *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1120-21 (C.D. Cal. 2003). For example, in the banking context, atypical banking procedures or transactions lacking business justification may help give rise to the conclusion that a bank had actual knowledge of the specific wrongdoing in question. *See Neilson*, 290 F. Supp. 2d at 1120-21.

## 2.    BofA's Argument

BofA contends that Plaintiff cannot prove its aiding and abetting claims on either of the two previously identified methods of proof. As to Method 1, BofA argues that Plaintiff has no evidence to show that BofA had actual knowledge of Reichart's embezzlement and conversion, or breach of fiduciary duty. BofA argues that Plaintiff was unable to provide any direct evidence of actual knowledge, and instead "simply restated the allegations of 'red flags' as listed in the complaint." BofA asserts that "red flags" are insufficient to demonstrate actual knowledge. (BofA's Mot. 7 (citing Wendlenner Decl. Ex. B (Pl.'s Resp to Special Interrogs.) at 6-10).) BofA also directs the court's attention to Steve Simi's deposition, in which he conceded that he had no knowledge regarding whether "someone at Bank of America assisted Mr. Reichart." (BofA's Mot. 7-8 (quoting Simi Dep. 341:14-19, 23-24).) According to BofA, these admissions show that Plaintiff cannot fulfill its burden of demonstrating that BofA had actual knowledge of Reichart's crimes, thus entitling BofA to summary judgment on the "Method 1" aiding and abetting claims.

As to Method 2, BofA contends these claims must fail because Plaintiff has failed to produce evidence that BofA's conduct was tortious[15] and constituted an independent breach of duty to

---

[15] In its moving brief BofA maintains that aiding and abetting liability can attach to a defendant only if the defendant's conduct was "tortious." (BofA's Mot. 9.) To the degree that this statement suggests that a defendant's acts of "substantial assistance" must be tortious, BofA is incorrect. Only one California case has made such a ruling, *see Coffman v. Kennedy*, 74 Cal. App. 3d 28, 32 (1977), and

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   Plaintiff.  (BofA's Mot. 9.)  First, BofA avers that it did not owe Plaintiff any fiduciary duty,

2   because "the relationship between a bank and a customer is not fiduciary in character," (BofA's

3   Mot. 9 (emphasis removed) (citation omitted)), and does not include a duty to supervise account

4   activity, inquire into the purposes for which funds are used, or prevent wrongdoing.  (BofA's Mot.

5   9.)  Similarly, BofA asserts that it cannot be held liable for conversion because "a bank cannot be

6   held liable for converting a customer's deposited funds," and because "a bank cannot convert a

7   cashier's check, because such an instrument is the bank's own money."  (BofA's Mot. 9, 10.)

8               **3. Discussion**

9               **a. Method 1: Actual Knowledge**

10              Due to the preclusive effect of Section 4406(f), the court may only consider non-precluded

11  unauthorized checks in analyzing whether Plaintiff has presented sufficient evidence such that a

12  reasonable jury could find that BofA had actual knowledge that Reichart was committing

13  embezzlement and conversion, and was breaching his fiduciary duty to Plaintiff.  As detailed above,

14  Plaintiff has unearthed prodigious amounts of information concerning how Reichart stole Plaintiff's

15  assets, and in particular how he interacted with BofA -- in particular, its tellers -- to this end.

16  Numerous aspects of Reichart's actions, such as his prolific use of cashiers checks; making

17  Plaintiff's checks out to the bank or "cash;" using Plaintiff's funds to pay for goods and services

18  unlikely connected to Plaintiff's business; having BofA alter the remitter on cashiers checks issued

19  with Plaintiff's funds; and performing some transactions in increments under $10,000, could lead a

20  jury to reasonably infer that BofA knew that Reichart was embezzling Plaintiff's funds.  *See*

21  *Bowoto*, 2007 WL 2349336, at *15 (jury may reasonably infer from "large quantity of circumstantial

22  evidence" that defendant had actual knowledge of wrong he was assisting); *Neilson*, 290 F. Supp. 2d

23  at 1120-21 (atypical banking procedures may support inference that bank had knowledge of Ponzi

24  scheme).  That fact that BofA knew that Reichart was Plaintiff's CFO, (Jt. Stmt 2), could also add to

25  a reasonable inference of actual knowledge of Reichart's breach of fiduciary duty to Plaintiff.

26  _____

27  all subsequent case law agrees that "liability for aiding and abetting may exist even where the
    defendant's conduct does not independently breach a duty to the plaintiff."  *In re Textainer P'ship Secs.*

28  *Litig.*, No. 05-969 MMC, 2006 WL 1328851, at *10 n.5 (N.D. Cal. May 15, 2006) (citing *Casey v. U.S.*
    *Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1144-45 (2005)).

United States District Court

For the Northern District of California

As previously held, pursuant to section 4406(f), Plaintiff may not offer as evidence any precluded unauthorized checks or time-barred forged checks.  At the hearing, the parties represented that, even if the court were to apply section 4406(f) claim preclusion and subsection 340(c)'s time bar, a significant number of allegedly unauthorized transactions would remain at issue.  Therefore, even with these evidentiary restrictions, Reichart's prolific fraudulent transactions could support a reasonable jury finding of BofA's actual knowledge of Reichart's embezzlement, conversion and breach of fiduciary duty.  *See Bowoto*, 2007 WL 2349336, at *15; *Neilson*, 290 F. Supp. 2d at 1120-21.  The court therefore cannot grant BofA summary judgment on Plaintiff's aiding and abetting claims on the grounds that Plaintiff cannot show that BofA had actual knowledge of Reichart's acts.

### b. Method 2: Independent Breach of Duty

A bank has limited duties to its customers.  The relationship between the two is not fiduciary, but rather is contractual in nature.  *Casey*, 127 Cal. App. 4th at 1150; *Grover v. Bay View Bank*, 87 Cal. App. 4th 452, 456 (2001) ("The relationship of bank and depositor is founded in contract.") (quoting *Chazen v. Centennial Bank*, 61 Cal. App. 4th 532, 537 (1998)).  As such, a bank has no duty to "'supervise account activity'" or to "'inquire into the purpose for which [account] funds are being used.'"  *Grover*, 87 Cal. App. 4th at 456 (quoting *Chazen*, 61 Cal. App. 4th at 537).  Nevertheless, the absence of fiduciary duties toward its customers does not mean that a bank has no duties to them at all.  The contract between a bank and its customers gives rise to a duty to "'act with reasonable care in its transactions with its depositors.'"  *Id.* (quoting *Chazen*, 61 Cal. App. 4th at 543.  "The duty is an implied term in the contract between the bank and its depositor."  *Chazen*, 61 Cal. App. 4th at 543 (citation omitted).  In exercising reasonable care in the transaction context, a bank "'is under a duty to pay checks only in strict accordance with its customer's order. . . . The bank is without authority to charge its customer's account with an unauthorized order.'"  *Fineman,* supra, 66 Cal. App. 4th at 1117 (quoting *Danning v. Bank of Am.*, 151 Cal. App. 3d 961, 969 (1984)) (ellipses in original); *see People v. Bartell*, 170 Cal. App. 4th 1258, 1262 (2009) ("[T]he bank promises to . . . debit [the customer's] account only at his direction").  "'[A] check with an unauthorized signature is not properly payable, and the bank breaches its agreement with its customer when paying such an

United States District Court
For the Northern District of California

1   item.'" *Fineman,* 66 Cal. App. 4th at 1117 (quoting *Danning*, 151 Cal. App. 3d at 969); *accord Roy*

2   *Supply, Inc.*, 39 Cal. App. 4th at 1062.[16]   Therefore, Plaintiff may argue that Defendant substantially

3   assisted Reichart's tort by independently breaching a duty to Plaintiff – namely, by honoring

4   unauthorized checks.

5          As discussed above, the disputed evidentiary record prevents the court from determining the

6   terms of the relevant contracts.  More specifically, the court cannot determine as a matter of law

7   whether the contract required BofA to honor checks with one signature, or if it required two

8   signatures.  Without this information, it is unclear whether BofA breached its duty to Plaintiff to

9   conduct transactions involving Plaintiff's accounts with reasonable care.  Specifically, the absence

10  of a contract obstructs determination of whether Reichart was authorized to negotiate Plaintiff's

11  checks with his signature alone and, thus, whether BofA paid Plaintiff's checks in accordance with

12  Plaintiff's contractually operative order.  If Reichart was authorized to sign alone, BofA may not

13  have breached its duty to Plaintiff; if Reichart was not so authorized, BofA may have breached this

14  duty.  Because these material issues of fact remain in dispute, the court denies BofA summary

15  judgment on these causes of action.

16         However, the calculus changes for the aiding and claims arising out of precluded or time-

17  barred checks.  Plaintiff may not rely on such checks to attempt to prove that BofA's conduct, when

18  allegedly giving substantial assistance to Reichart's tortious acts, constituted a separate breach of

19  duty to Plaintiff.  The only duty that Plaintiff has adequately alleged that BofA owed to it was to act

20  with reasonable care when performing transactions with Plaintiff.  The only breach of this duty

21  which Plaintiff has alleged is the duty to pay Plaintiff's checks in strict accordance with Plaintiff's

22  order.  Because Plaintiff may not offer as evidence any unauthorized signature for the claims resting

23  on precluded or time-barred checks, Plaintiff cannot demonstrate that BofA breached this duty as to

---

[16] At the February 14, 2013 motion hearing, Plaintiff posited that BofA owed it a duty to issue cashiers checks with reasonable care.  However, Plaintiff could not cite any statute or case law to support this assertion.  Because California law defines a cashiers check as "a draft with respect to which the drawer and drawee are the same bank or branches of the same bank," it is unclear how BofA would acquire a duty to Plaintiff when issuing one.  Cal. Comm. Code § 3104(g).

those checks.  The court therefore grants summary judgment on that portion of Plaintiff's claims.

## V. Conclusion

For the reasons above, the court grants in part and denies in part Defendant's motion for summary judgment.  Except as specified below, the court denies summary judgment on Plaintiff's breach of contract claims and aiding and abetting claims.  The court finds that the one-year statute of limitations in California Civil Procedure Code § 340(c) applies to Plaintiff's claims arising from Reichart's forgery of a signature on Plaintiff's checks and therefore dismisses all claims arising from a forged check which appeared on bank statements received by Plaintiff prior to April 18, 2007.  The court also finds that the one-year issue preclusion in California Commercial Code § 4406(f) applies to Plaintiff's claims arising out of precluded, unauthorized checks, as defined *supra*.  Consequently, the court dismisses the portion of Plaintiff's breach of contract claim to the extent it arises out of precluded checks and alleges that BofA breached its duty to Plaintiff by not conducting its transactions with reasonable care.  The court also finds that with respect to Plaintiff's Method 1 aiding and abetting claims, Plaintiff may not rely on the existence of an unauthorized signature on precluded checks to prove that BofA had actual knowledge of Reichart's crimes, nor may Plaintiff seek damages for recovery of amounts paid on precluded checks. The court also dismisses Plaintiff's Method 2 aiding and abetting claims to the extent it relies on, or seeks damages in the form of recovery of amounts paid on the precluded checks.

IT IS SO ORDERED.


Dated: March 15, 2013

_____
DONNA M. RYU
United States Magistrate Judge

26